IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-01864-REB-KLM

JEFFREY SCHUDEL,

    Plaintiff,

v.

LA SALLE POLICE OFFICER DAVID MILLER, in his individual and official capacities,
LA SALLE POLICE OFFICE VICTOR ERAZO, in his individual and official capacities, and
DALE PARRISH, ESQ.,

    Defendants.

_____

# ORDER
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

This matter is before the Court on the **Renewed Motion to Sever** [Docket No. 73; Filed March 6, 2013] (the "Motion"), filed by Defendants David Miller ("Miller") and Victor Erazo ("Erazo") (collectively, the "LaSalle Defendants"). On March 22, 2013, Plaintiff filed a Response [#74]. On March 27, 2013, Defendant Dale Parrish, Esq. ("Parrish") filed a Response [#76]. On April 5, 2013, the LaSalle Defendants filed a Reply [#81]. The Motion is now ripe for resolution.

## I. Background

According to the Amended Complaint, Plaintiff and his then-girlfriend Shantele Sherman ("Sherman") gave birth to a son, Noah Schudel ("Noah"), on February 27, 2009. *Am. Compl.* [#69] ¶ 11. Plaintiff and Ms. Sherman married shortly thereafter. *Id.* On August 24, 2009, Plaintiff and Ms. Sherman had an argument about her "lifestyle and

choices," which led to Plaintiff asking Ms. Sherman to leave the family home. *Id.* ¶ 12. Ms. Sherman moved out of Plaintiff's home and moved into her mother's home in LaSalle, Colorado, taking Noah and her other children with her. *Id.*

The day after Ms. Sherman moved out, she received a call from Plaintiff's lawyer informing her that Plaintiff "intended to exercise his parenting rights with Noah" and asking Ms. Sherman "to surrender Noah at the lawyer's office." *Id.* ¶ 13. That same day she spoke with Defendant Dale Parrish, Esq. ("Parrish"), about her parenting rights. *Id.* ¶ 14. Defendant Parrish told her to seek a temporary restraining order ("TRO") against Plaintiff, which would provide Defendant Parrish with time "to familiarize himself with Sherman's situation in order to prevent Schudel from exercising his custodial rights." *Id.* ¶ 15. Plaintiff alleges that Defendant Parrish told Ms. Sherman to lie if necessary to obtain the TRO. *Id.* On August 27, 2009, Ms. Sherman obtained the TRO. *Id.*

On September 14, 2009, Plaintiff was involved in a major motor vehicle accident. *Id.* ¶ 16. Ms. Sherman was contacted by rescue personnel and went to the hospital to see Plaintiff, which caused Plaintiff "to inadvertently violate" the TRO. *Id.* ¶ 17. Plaintiff spent a week in jail as a result of this violation, after which the TRO was dismissed at Ms. Sherman's request. *Id.*

On April 14, 2010, Plaintiff filed for divorce from Ms. Sherman, leading to a "bitter" custody battle for Noah. *Id.* ¶ 18. Defendant Parrish represented Ms. Sherman in these proceedings and allegedly repeatedly encouraged Ms. Sherman "to falsely accuse [Plaintiff] of committing acts of domestic abuse, so as to increase the likelihood that [Ms.] Sherman would be granted primary custody" of their son. *Id.* ¶ 19. Throughout the proceedings, Defendant Parrish "made numerous sexual overtures toward Sherman, including but not

limited to repeated incidents of inappropriate touching, and repeated suggestions that she could pay her outstanding legal bill by means other than monetary compensation." *Id.* ¶ 20.

On May 20, 2010, Ms. Sherman and Defendant LaSalle Police Officer Victor Erazo ("Erazo") engaged in a sexual relationship. *Id.* ¶ 21. Later that month, Defendant Erazo called Plaintiff, threatening to arrest him for text messages Plaintiff had sent to Ms. Sherman, even though Defendant Erazo allegedly later admitted that the texts were neither illegal nor inappropriate. *Id.*

In June 2010, Plaintiff hired Timothy Stitt ("Stitt") to investigate Ms. Sherman "so as to evaluate her fitness and ability to care for their infant son." *Id.* ¶ 22. Some time soon after 5:30 p.m. on July 19, 2010, while in Denver, Colorado, Ms. Sherman found a Global Positioning System ("GPS") device hidden under her car. *Id.* ¶ 23. Plaintiff alleges that she joked with a friend who was with her at the time that she should attach the device to the bottom of a delivery truck. *Id.* ¶ 24. Ms. Sherman then made the hour-long drive back to LaSalle, Colorado, and called the LaSalle Police Department around 8:30 p.m. *Id.* ¶¶ 24, 26.

Defendant LaSalle Police Officer David Miller ("Miller") met with Ms. Sherman at her residence, where she gave him the GPS device. *Id.* ¶ 26. Plaintiff avers that although Defendant Miller "received the GPS device at approximately 8:30 p.m., [Defendant] Miller wrote on the evidence bag that he received it at 6:30 p.m., in order to reduce the time gap between the incident and Sherman's report to police." *Id.* Plaintiff alleges that Defendant Miller later admitted that he fabricated the time on the evidence bag. *Id.* At this same meeting, Ms. Sherman also provided a written statement to Defendant Miller that did not

include any reference to emotional distress. *Id.* ¶ 27. After reading the document, Defendant Miller allegedly coached her to add a statement about how she felt "threatened," which Ms. Sherman obediently added. *Id.* ¶ 27. Defendant Miller thereafter returned to the LaSalle Police Department and was informed by Assistant District Attorney Jennifer Hill that one of the elements of the crime of stalking under Colorado law is that the victim suffer severe emotional distress. *Id.* ¶ 28.

Defendant Miller called Plaintiff to accuse him of placing the GPS on Ms. Sherman's vehicle. *Id.* ¶ 29. Plaintiff informed Defendant Miller that he had hired a private investigator in connection with the divorce and child custody proceedings. *Id.* Plaintiff thereafter asked Mr. Stitt to call Defendant Miller, which he did within the hour. *Id.* ¶¶ 29-30. Mr. Stitt explained that he placed the GPS device on Ms. Sherman's car while it was parked at her mother's home in LaSalle, Colorado, and that it "did not record real time data, but must be recovered and the information downloaded." *Id.* ¶ 30. Mr. Stitt agreed to meet with Defendant Miller at the LaSalle Police Department, but when he arrived he was arrested and subsequently charged for the crime of stalking. *Id.* ¶¶ 30-31.

After the arrest, Defendant Miller met with Ms. Sherman at her residence again, told her that severe emotional distress was an element of the crime of stalking, and that such things as severe upset stomach, anxiety, and pressure in the chest could qualify as such distress. *Id.* ¶ 32. Based on this conversation, Ms. Sherman prepared a second written statement about the GPS device, in which she stated that she was "emotionally upset and not feeling well" and that "her privacy had been violated." *Id.* ¶ 33. Plaintiff avers that Defendant Miller used these allegedly fabricated statements to create an affidavit to support a warrant for Plaintiff's arrest, although no warrant was ever actually issued. *Id.*

¶¶ 33-34.

The next day, on July 20, 2010, Ms. Sherman and Defendant Erazo, who were still in an "intimate relationship," met so Ms. Sherman could tell him about the events of the previous day. *Id.* ¶ 35. He told her not to disclose that she knew prior to July 19, 2010 that she was being followed by a private investigator. *Id.* He also allegedly "expressed a strong desire to obtain a criminal conviction" against Plaintiff. *Id.* Plaintiff alleges that Ms. Sherman heeded Defendant Erazo's advice and did not reveal her prior knowledge of being followed, which Plaintiff asserts contributed to his arrest and subsequent prosecution and incarceration. *Id.* ¶ 36. Plaintiff avers that Ms. Sherman's prior knowledge was material, that if she already knew that a private investigator was following her, additional surveillance measures such as the GPS device should not have had a significant impact on her mental state, and that her prior knowledge when combined with other evidence indicating lack of emotional distress would have negated a finding of probable cause as to the emotional distress required for a charge of felony stalking. *Id.* ¶ 37.

That same day, Plaintiff's parole officer, Evangeline Graziano ("Graziano"), spoke with Defendant Miller about the GPS incident, at which time Defendant Miller allegedly told her "of all the false, omitted, and coached information contained in the warrant application, and also falsely apprised [Ms.] Graziano that a warrant [for Plaintiff's arrest] had been issued." *Id.* ¶ 38. The next day, Ms. Graziano purportedly arrested Plaintiff on charges of felony stalking, although Plaintiff asserts that her decision was based "on the false, omitted, and coached information" given to her by Defendant Miller. *Id.* ¶ 39. On July 29, 2010, a charge of Class 5 Felony Stalking was filed against Plaintiff in Weld County, Colorado. *Id.* ¶ 40. On September 30, 2010, Defendant Miller testified at a preliminary hearing as to the

contents of Ms. Sherman's two written statements, leading to a finding by the court that probable cause existed. *Id.* ¶ 41.

On October 6, 2010, a permanent orders hearing was held in the divorce matter, although Plaintiff could not attend because of his incarceration. *Id.* ¶ 42. During the hearing, allegedly at the urging of Defendant Parrish, the allegedly false accusations that Plaintiff had committed acts of domestic abuse against Ms. Sherman were repeated, leading to full custody of Noah being awarded to Ms. Sherman. *Id.*

On January 6, 2011, Ms. Sherman met with Defendant Miller and Assistant District Attorney ("ADA") Katherine Conner ("Conner"), who was handling the stalking case against Plaintiff. *Id.* ¶ 43. ADA Conner informed Ms. Sherman that the charge against Plaintiff would be dropped because of insufficient evidence of severe emotional distress. *Id.* Ms. Sherman responded that "she suspected [Plaintiff] had hacked into her computer, and that he had bragged of killing a man with his bare hands." *Id.* ¶ 44. Plaintiff alleges that Defendant Miller knew these claims were false but helped Ms. Sherman write them in a report, which they later unsuccessfully attempted to introduce at Plaintiff's trial. *Id.* On January 17, 2011, the District Attorney's Office dismissed the felony stalking charge based on lack of proof of severe emotional distress and dropped the charge to misdemeanor harassment. *Id.* ¶ 45.

On February 1, 2011, Defendant Parrish advised Ms. Sherman to request another TRO, allegedly telling her to lie if necessary, in case Plaintiff won his criminal trial and subsequently sought parenting time with Noah after his release from prison. *Id.* ¶ 46. Plaintiff avers that Defendant Parrish's advice was not offered out of concern for Ms. Sherman's safety but was, rather, simply a means to gain an advantage in the domestic

relations court. *Id.* Plaintiff also asserts that Defendant Parrish hoped success would help Ms. Sherman succumb to his sexual advances. *Id.* Ms. Sherman followed Parrish's advice and sought a TRO based on the same allegations that were the basis of Plaintiff's criminal charges. *Id.* Just before his trial, Plaintiff was served with a second TRO; it was later converted to a permanent restraining order. *Id.*

On February 9, 2011, Plaintiff's criminal trial was held, at which he was acquitted of all charges. *Id.* ¶ 47. He was released from custody on February 11, 2011; he had been imprisoned since July 21, 2010. *Id.* ¶ 48. He did not see Noah during this entire period. *Id.* ¶ 49. His incarceration also prevented his attendance at the final orders hearing regarding Noah's custody, and Plaintiff's visitation rights were not reinstated until August 2011. *Id.* ¶ 50. In December 2011, the permanent restraining order was dismissed. *Id.*

Plaintiff asserts three claims in this matter: (1) unreasonable seizure pursuant to the Fourth Amendment due to lack of probable cause, against the LaSalle Defendants; (2) unreasonable search, seizure, and prosecution pursuant to the Fourth and Fourteenth Amendments due to malicious prosecution, against the LaSalle Defendants; and (3) abuse of process, against Defendant Parrish. *Id.* ¶¶ 51-71.

## II. Analysis

The LaSalle Defendants assert that the claim against Defendant Parrish should be severed from the claims against them pursuant to Fed. R. Civ. P. 21. *Motion* [#73] at 3. Rule 21 states: "Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party. The Court may also sever any claim against a party." Misjoinder pursuant to Rule 21 "occurs when there is no common question of law or fact or when . . . the events that give rise to the plaintiff's

claims against defendants do not stem from the same transaction." *Nasious v. City & Cnty. of Denver*, 415 Fed. App'x 877, 880 (10th Cir. 2011) (citing *DirecTV, Inc. v. Leto*, 467 F.3d 842, 844 (3d Cir. 2006)). "To remedy misjoinder, . . . the court has two remedial options: (1) misjoined parties may be dropped on such terms as are just; or (2) any claims against misjoined parties may be severed and proceeded with separately." *Id.* at 880-81 (citation omitted). A trial court retains broad discretion as to whether to sever parties or claims. *Nat'l Ass'n of Investors Corp. v. Bivio, Inc.*, No. 10-cv-00567-WJM-MEH, 2011 WL 1059835, at *2 (D. Colo. Mar. 21, 2011) (citing *German by German v. Fed. Home Loan Mortg. Corp.*, 896 F. Supp. 1385, 1400 (S.D.N.Y.1995)).

The Tenth Circuit Court of Appeals has provided little guidance regarding when a motion for severance should be granted.[1] In *Ravenswood Investment Company, L.P. v. Avalon Correctional Services*, 651 F.3d 1219, 1222 (10th Cir. 2011), the Tenth Circuit mentioned, without comment, that the district court had "considered the expense and time invested in the case and the various prejudices to the parties" in determining whether to dismiss or sever pursuant to Rule 21. Averring that neither the Tenth Circuit nor the District of Colorado courts have yet set forth a standard for severance pursuant to Fed. R. Civ. P. 21, the LaSalle Defendants, and the parties in their Responses, discuss factors the Court should use to make its determination as set forth in *Merrill Lynch & Co., Inc. Research*

---

[1] In contrast, the Tenth Circuit has provided considerably more guidance pertaining to dismissal of an action and adding/dropping parties to an action where misjoinder is found pursuant to Rule 21. *See, e.g.*, *Ravenswood Inv. Co., L.P. v. Avalon Corr. Servs.*, 651 F.3d 1219, 1224 (10th Cir. 2011) (discussing dropping a party pursuant to Rule 21 and issues of diversity jurisdiction); *Nasious v. City & Cnty. of Denver-Denver Sheriff's Dep't*, 415 Fed. App'x 877, 881 (10th Cir. 2011) (discussing dismissal and severance pursuant to Rule 21 and resulting statute of limitations issues); *Bradsaw v. Lappin*, 320 Fed. App'x 846, 849 (10th Cir. 2009) (same); *Shaw v. AAA Eng'g & Drafting Inc.*, 138 Fed. App'x 62, 66-67 (10th Cir. 2005); *Jones v. Berry*, 33 Fed. App'x 967, 973 n.7 (10th Cir. 2002) (discussing the effect of Rule 21 severance on transfer of a portion of a case).

*Reports Sec. Litig.*, 214 F.R.D. 152 (S.D.N.Y. 2003). *Motion* [#73] at 8; *Response* [#74] at 4; *Response* [#76] at 3; *Reply* [#81] at 4. *Merrill Lynch* sets forth five factors that should be weighed when determining whether to grant a severance motion:

> (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated [by severance]; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims.

*Merrill Lynch*, 214 F.R.D. at 154-55. *Merrill Lynch*, of course, is not binding in this jurisdiction.

The current two-step standard employed in this judicial district is simpler than the multi-factor test espoused by the parties. The Court must first determine whether misjoinder has occurred. *See Magluta v. U.S. Fed. Bureau of Prisons*, No. 11-cv-02381-PAB-KLM, 2013 WL 1151815, at *2 (D. Colo. Mar. 19, 2013). If it has, the Court then separately determines whether to drop parties or sever claims. *See id.*

As for the first step, misjoinder "occurs when there is no common question of law or fact or when . . . the events that give rise to the plaintiff's claims against defendants do not stem from the same transaction." *Nasious*, 415 Fed. App'x at 880. The LaSalle Defendants argue that Plaintiff alleges that they asserted falsehoods in relation to the criminal case against him but that Plaintiff alleges that Defendant Parrish urged Ms. Sherman to lie regarding custody of the child. *Motion* [#73] at 5. The LaSalle Defendants further argue that there are no common questions of law or fact in part because the claims made against them are pursuant to federal law and the claim against Defendant Parrish is a state law cause of action, *i.e.*, abuse of process. *Id.* at 5-6.

-9-

Plaintiff responds that the claims against all Defendants arise from the same transaction or occurrence, *i.e.*, the Schudel-Sherman child-custody dispute. *Response* [#74] at 4. Plaintiff also avers that the claims have at least one common question of fact, *i.e.,* "the extent of the harm suffered by [Plaintiff] after the Defendants' combined conduct caused him to lose custody of his infant son." *Id.* Defendant Parrish agrees with Plaintiff. *Response* [#76] at 3. He states that "all of the actions complained of by Plaintiff were part and parcel of the dissolution of marriage proceedings involving Plaintiff and his ex-wife." *Id.* Defendant Parrish further avers that there will be common questions of fact that will be resolved by the testimony of Plaintiff's ex-wife, a primary witness in the case. *Id.* The LaSalle Defendants reply that "[t]he alleged actions of the LaSalle Defendants may have affected the divorce and custody proceedings in some ancillary way, but . . . [i]t matters not for purposes of severance that the reason Plaintiff engaged in criminal behavior was to assist him in the divorce and custody proceedings." *Reply* [#81] at 5-6.

Examining the allegations in the Amended Complaint and weighing the parties' arguments, the Court finds that Defendant Parrish and the LaSalle Defendants have not been misjoined in this matter. The primary events in this case are the alleged acts of interference by the parties regarding the dissolution of Plaintiff and Ms. Sherman's marriage and the ensuing custody battle over their child. One of the primary common issues of fact in the case relates to the TRO sought by Defendant Parrish in February 2011, which Plaintiff alleges was based on the same false allegations that formed the basis of the criminal charges instigated by the LaSalle Defendants. The Court finds that these considerations warrant a finding pursuant to *Nasious* that all Defendants were properly joined.

The Court therefore concludes that Defendants in this matter have not been misjoined and that the claim against Defendant Parrish should not be severed from the claims against the LaSalle Defendants. *See Nat'l Ass'n of Investors Corp.*, 2011 WL 1059835, at *2 (stating that the Court retains broad discretion as to whether to sever parties or claims).[2]

### III. Conclusion

Based on the foregoing,

IT IS HEREBY **ORDERED** that the Motion [#73] is **DENIED**.

DATED: April 29, 2013 at Denver, Colorado.

BY THE COURT:

Kristen L. Mix
United States Magistrate Judge

---

[2] The Court notes that this Order does not preclude the LaSalle Defendants from later seeking a separate trial from Defendant Parrish, pursuant to Fed. R. Civ. P. 42(b).